IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SHARON OAKES                          :                    CIVIL ACTION
                                      :
            v.                        :
                                      :
JO ANNE B. BARNHART,                  :                    NO. 04-5072
Commissioner of the Social Security   :
Administration                        :

O'NEILL, J.                                               OCTOBER 18, 2005

<u>MEMORANDUM</u>

Plaintiff, Sharon Oakes, filed an action under 42 U.S.C. § 405(g) seeking review of the final decision by defendant, Jo Anne Barnhart, Commissioner of the Social Security Administration, to deny her eligibility for disability insurance benefits under Title II of the Social Security Act. This case was assigned to Magistrate Judge Jacob Hart for a Report and Recommendation. Upon consideration of the parties' cross motions for summary judgment, defendant's response, and plaintiff's reply, Judge Hart recommended that plaintiff's "motion be granted in part and that the matter be remanded for the taking of medical evidence on the subject of whether the combination of her impairments equals a listed impairment." Defendant subsequently filed objections to the report and recommendation, to which plaintiff filed a response. I held oral argument in this case on September 27, 2005 to determine whether it is necessary as a matter of law for an ALJ to seek medical evidence to decide whether plaintiff's impairments equal a listed impairment under the Social Security Administration's testing modifications, 20 C.F.R. § 404.906 (2005). For the reasons that follow, I decline to adopt Judge Hart's report and recommendation and will grant summary judgment in favor of defendant.

BACKGROUND

I.      Nonmedical Facts

Oakes filed for disability benefits for the first time in 1985, alleging that she had been disabled since 1978.  Her claim was denied at the initial level of review in July 1985 and she did not request further review.  She resumed work after her benefits were denied.

On June 3, 2003, Oakes filed a new application for disability insurance benefits alleging that she had been disabled since December 11, 2002 as a result of diabetes, peripheral neuropathy, and erythema multiforme disorder.[1]  The Regional Commissioner initially denied Oakes' application.  Oakes subsequently requested a hearing before an administrative law judge.

Oakes was forty four years old at the time of the ALJ's decision.  She was, therefore, defined as a "younger individual" under 20 C.F.R. § 040.1563(c) (2005).  Oakes has a GED and has attended two years of college.  She has worked as a physical therapy aide, ophthalmology assistant, mail clerk, general clerk, insurance clerk, cashier, and sandwich maker.  She has testified that she can do laundry without lifting or carrying, go grocery shopping with assistance, take public transportation, read, and listen to music.  She has also testified that she is functionally independent in activities of daily living.

---

[1]Erythema multiforme (EM) is the name applied to a group of hypersensitivity disorders, affecting mostly children and young adults, and characterized by symmetric red, patchy lesions, primarily on the arms and legs.  The cause is unknown, but EM frequently occurs in association with herpes simplex virus, suggesting an immunologic process initiated by the virus.  In half of the cases, the triggering agents appear to be medications, including anticonvulsants, sulfonamides, nonsteroidal anti-inflammatory drugs, and other antibiotics.  In addition, some cases appear to be associated with infectious organisms such as Mycoplasma pneumoniae and many viral agents.

Erythema Multiforme, WebMD Health Guide A-Z, available at
http://my.webmd.com/hw/skin_and_beauty/nord280.asp#nord280-general-discussion (last visited October 11, 2005).

II.      Medical Evidence With Respect to Oakes' Physical Impairments

Oakes has been diagnosed with L5-S1 facet assymetry with radiculopathy into the left leg, a shallow central disc bulge at C3-4 and minimal central disc bulge at C5-6, insulin dependent diabetes mellitus, bilateral peripheral neuropathy of the feet, and obesity.  On July 8, 2002, five months prior to her alleged onset of disability, Oakes was injured in a motor vehicle accident, resulting in complaints of chest, mid-back, and lower knee pain.  She was diagnosed with thoracic sprain and strain, rib pain, and a knee sprain.  She was prescribed four to six weeks of physical therapy.

In November 2002, Dr. Michael McCoy reported that Oakes had shown improvement but still suffered from some limitations in her cervical and lumbar range of motion.  Also in November 2002, Dr. Arthur Smith noted that Oakes' diabetes was uncontrolled and that she was not taking her insulin.  On December 18, 2002, one week after her alleged onset of disability, Oakes underwent an occupational therapy functional assessment, in which she stated that she was independent in functional mobility, activities of daily living, cooking, cleaning, light laundry, and trash removal.  The occupational therapist stated that Oakes was limited in all areas of heaving lifting, bending, and squatting.  He also stated that she could benefit from occupational training in proper body mechanics.  Also in December 2002, Dr. Smith noted that Oakes' blood sugar was still uncontrolled.  He, therefore, increased her Glucophage and considered increasing her insulin.

On April 21, 2003, Oakes presented herself at the emergency room complaining of foot pain, numbness, and tingling.  Upon examination, the treating physician noted that she had 4/5 motor power in her right arm and leg and 5/5 (i.e. full ) motor power in her left arm and leg.  She lacked sensation in her large and second toes bilaterally but sensation in her feet was largely

intact.  The treating physician diagnosed her with diabetic neuropathy and prescribed Neurontin.

Oakes left the emergency room without receiving treatment.  In June 2003, Oakes was referred to

a diabetes specialist, but did not see the specialist until September 2003.  In July 2003, Dr. Smith

noted that Oakes' blood sugar remained high and that she had foot pain.

On August 21, 2003, Dr. Ronald Block, examined Oakes on a consultative visit.  Upon

physical examination, Oakes was pleasant, well developed, well nourished, and not in acute

distress.  At that time, she was five feet and three and one half inches tall and 226 pounds.  Dr.

Block founder her blood pressure to be normal.  She was awake, alert, and oriented in all spheres.

She had mild weakness in her right arm and leg.  She was able to ambulate without assistance.

She swayed when standing with her feet together.  Her ranges of motion were intact.  Dr. Block

diagnosed her with poorly controlled diabetes, peripheral neuropathy, obesity, and erythem

multiformis.  Despite his findings, Dr. Block determined that she could only lift two to three

pounds, stand for an hour or less, and sit for an unlimited period of time, with no pushin/pulling,

postural activities, and with limited reaching, handling, fingering, and seeing.  Also in August

2003, Dr. Smith noted that Oakes's diabetes was still uncontrolled.  He, therefore, increased her

dosage of Neurontin to relieve her peripheral neuropathy.

On September 19, 2003, after reviewing the medical evidence, a disability examiner

determined: (1) that Oakes could lift ten pounds frequently and twenty pounds occassionally; (2)

that she could stand/walk for at least two hours in an eight hour day; (3) that she could sit for

about six hours in an eight hour day; (4) that she was limited in pushing/pulling with her legs; (5)

that she could perform all postural maneuvers occasionally; and (6) that she had no manipulative limitations.  The examiner supported the assessment with specific references to the medical evidence.

Also on September 19, 2003, Dr. Nayyar Iqbal evaluated Oakes' diabetes.  Upon physical examination, Dr. Iqbal noted her abdominal obesity, normal strength, and normal neurological findings.  Dr. Iqbal adjusted her treatment regimen and referred her to a diabetes education program.  In October 2003, Dr. Smith reported that Oakes continued to have uncontrolled diabetes and peripheral neuropathy.  Oakes reported to Dr. Smith that she had mood swings and irritability.  On October 30, 2003, Dr. Joseph Carver similarly diagnosed her with atypical chest pain, hyperlipidemia with unfavorable lipid profile, and poorly controlled brittle diabetes mellitus.

On November 15, 2003, Dr. Curtis Slipman examined Oakes for complaints of back pain. Oakes stated that she had pain sitting or standing for more than one hour and that she could only lift very light objects.  She reported that she was functionally independent with her activities of daily living.  Upon physical examination, Dr. Slipman found that she was alert and not in acute distress, that her skin was normal, and that she had tenderness on palpation.  Her straight leg test[2]

---

[2]For a straight-leg test for low back pain, you lie on your back with both legs straight. Your health professional raises one of your legs upward, keeping the knee straight.  If you have pain down the back of your leg below the knee when your leg is raised, the test is positive (abnormal).  If doing this test on the unaffected leg causes pain in the affected leg, it is more likely that you have a herniated disc. This is known as crossover pain.

Straight-leg test for evaluating low back pain, WebMD Health Guide A-Z, available at http://my.webmd.com/hw/health_guide_atoz/hw47310.asp?navbar=hw55940 (last visited October 11, 2005).

5

was negative.  Patrick's test[3] was positive on the right side.  She walked with an antalgic gait.  Her sensory examination was normal to pinprick and light touch in her arms and legs.  Her manual motor testing was normal except for dorsiflexion (i.e. backward bending) of the right leg.  Her coordination was normal.  The differential diagnosis was possible instability at L5-S1 (though x-rays later confirmed that she had no instability).  Dr. Slipman recommended a repeat CT scan of her lower back.  On November 21, 2003, Oakes complained of burning sensations under her feet.  Dr. Iqbal noted her noncompliance with her prescribed diet and lack of exercise.  Her physical examination was normal except for obesity.  She was instructed to attend the prescribed classes and to lose weight.  On November 28, 2003, Oakes underwent an x-ray of her lumbar spine which showed Grade I anterolisthesis of L5-S1 and osteoarthritis of the facet joints at that level.  A followup CT scan of the lumbar spine confirmed degenerative changes at L3-4, L4-5, and L5-S1, with

On December 9, 2003, Oakes had a stress test which was negative for ischemia (i.e. lack of oxygen-rich blood being supplied to the heart muscle to meet the heart's needs).  On December 19, 2003, she had x-rays of her left foot; no acute abnormalities were seen.  On December 31, 2003, Dr. Smith deemed her diabetes poorly controlled.  He discovered that she was using the wrong type of insulin in her pump.  He changed her insulin pump and Neurontin dosage.

---

[3]Patrick's test, also known as Faber's test, is a test for disease of the sacroiliac joint, which forms "the junctions between the spine and each side of the pelvis. Like the vertebrae in the lower back (lumbosacral region), the sacroiliac joints bear the weight and stress of the torso, which makes them susceptible to injury."  Sacroiliac joints, WebMD Health Guide A-Z, available at http://my.webmd.com/hw/health_guide_atoz/sts14353.asp?navbar=tp21142 (last visited October 11, 2005); see also Def.'s Br. in Opposition at 8-9, n. 5 citing Stedman's Med. Dictionary 1782 (26th ed. 1995).

On January 6, 2004, Dr. Philip Tasca reviewed Oakes' x-rays and opined that she had no sign of back instability. She had Grade I anterolisthesis[4] at L5-S1, and bulging discs at L3-4 and L4-5. Upon physical examination, she had 4/5 strength on the right and 5/5 (i.e. full) strength on the left. On January 9, 2004, Dr. Smith assessed Oakes' physical ability to perform work related activities. He assessed that she could lift less than ten pounds, stand/walk for less than two hours in an eight hour workday, and sit by periodically alternating between sitting and standing. Dr. Smith also assessed that she was limited in pushing/pulling with her legs and limited in postural maneuvers and manipulation. On February 27, 2004, Dr. Iqbal reported that Oakes' blood sugar levels were much improved. She was watching her diet but was still not exercising. On March 4, 2004, Dr. Brad Tinkerman completed a form to allow her to gain reduced transit fares in which he checked off that her difficulty with stairs and standing was a "permanent disability."

III.    Medical Evidence With Respect to Oakes' Mental Impairment

On November 7, 2003, Oakes presented herself at Northwestern Human Services stating that she had suicidal ideation. At that time, she was appropriately groomed and cooperative; her speech was normal and her thoughts were appropriate. Her mood was depressed but her affect was normal. She agreed to counseling once per week. On November 14, 2003, Oakes' mental

---

[4]The vertebrae are the bones that protect the spinal cord. Each vertebra has a thick drum-shaped area in front called a vertebral body. Between the vertebrae are spaces that allow nerves (nerve roots) to go from the spinal cord to other parts of the body. In anterolisthesis, the upper vertebral body is positioned abnormally compared to the vertebral body below it. More specifically, the upper vertebral body slips forward on the one below. The amount of slippage is graded on a scale from 1 to 4. Grade 1 is mild (20% slippage), while grade 4 is severe (100% slippage).

Anterolisthesis, Cedars-Sinai Medical Center, available at http://www.csmc.edu/5727.html (last visited on October 11, 2005).

status was unchanged.  She had good insight into her mental health issues but appeared hesitant to help herself due to external medical issues.  By November 21, 2003, she was more upbeat; her mood and affect were normal and she no longer considered suicide an option.

On December 17, 2003, Dr. Syed Rizvi, a psychiatrist at Northwestern, psychiatrically evaluated Oakes in response to her complaints of longstanding depressed mood, low energy, sadness, and irritability.  Upon examination of her mental status, Dr. Rizvi reported: (1) that she made good eye contact; (2) that her attitude was cooperative; (3) that her motor behavior was normal; (4) that her mood was depressed; (5) that her affect was restricted; (6) that her speech was normal; (7) that her thought process was coherent, logical, and goal directed; (8) that she denied suicidal ideation; (9) that she was alert and oriented to time, place, and person; (10) that her memory was intact; and (11) that her judgment and insight was fair.  Dr. Rizvi rated her global assessment of functioning at fifty.

On January 16, 2004, Oakes reported headaches (CT scans were normal) and increased depression around the holidays.  On January 22, 2004, she was in better spirits; she expressed a desire to perform volunteer work at the hospital.  Her mental status evaluation was normal.  By January 30, 2004, she reported feeling more energetic and willing to do things outside of her house.  She was upbeat, goal oriented, and hopeful.  Her mood, affect, and thoughts were normal.

On February 4, 2004, Dr. Nwe Oo, a psychiatrist, assessed Oakes' mental ability to perform work related activities.  No treatment notes accompanied this assessment.  Dr. Oo determined that she had an excellent/good ability to understand and carry out short instructions, perform within a schedule, act appropriately, adhere to a standard of cleanliness, take appropriate precautions around hazards, and perform daily activities without unreasonable dependence on

8

others.  Dr. Oo determined that she had a marked ability to maintain attention and concentration

for extended periods, sustain tasks without breaks, perform at a consistent pace, and react

appropriately to stress.  Plaintiff's ability was rated fair in all other categories.

IV.     The ALJ's Decision

On April 20, 2004, at Oakes' request, the administrative law judge held a hearing in

which Oakes and an impartial vocational expert testified.  On May 27, 2004, the ALJ issued a

decision finding that Oakes could perform her past relevant, sedentary job as an insurance clerk

and, therefore, was not disabled.  Applying the five step sequential evaluation process for

disability claims, 20 C.F.R. § 404.1520, the ALJ found that Oakes had not engaged in substantial

gainful activity since her alleged onset of disability.  The ALJ found that Oakes had a lumbar

impairment, diabetes with peripheral neuropathy of the feet, and obesity, and determined that

these impairments did not meet or equal any impairment listed in 20 C.F.R. pt. 404, subpt. P app.

1.  The ALJ determined that her depression, diminished visual acuity, and erythema multiform

were nonsevere impairments.  The ALJ found that she retained the residual functional capacity to

perform sedentary work with a sit/stand option, with only occasional stair climbing, ramp

climbing, bending, kneeling, crouching, and crawling, no overhead reaching, and appropriate

environmental restrictions.  Based on Oakes' functional limitations, the ALJ found that she could

perform her past relevant work as an insurance clerk.  In the alternative, based on her age,

education, past work experience, RFC, and the testimony of the vocational expert, the ALJ

determined that she could perform other work, including charge account clerk, callout operator,

and surveillance system monitor.  The ALJ, therefore, concluded that Oakes was not disabled.

The Appeals Council denied Oakes' request for review, on August 27, 2004, making the ALJ's

9

decision the final decision of the Commissioner.  Having exhausted her administrative remedies,

Oakes filed the instant action seeking judicial review of the Commissioner's decision.

STANDARD OF REVIEW

28 U.S.C. § 636(b)(1) requires a district court to "make a de novo determination of those

portions of the [magistrate judge's] recommendations to which objection is made."  It further

allows the court to "accept, reject, or modify, in whole or in part, the findings or

recommendations made by the magistrate."  Id.; see Haines v. Liggett Group, Inc., 975 F.2d 81,

91 (3d Cir. 1992); Terwilliger v. Chater, 945 F. Supp. 836, 841 (E.D. Pa.1996).  However, when

reviewing a decision of the Commissioner of Social Security to deny disability benefits, the

district court's role is limited to determining whether the Commissioner properly applied the

appropriate legal standards.   Judge Hart correctly held that the issue to be addressed on appeal

from a denial of benefits is whether the Commissioner's decisions are "supported by substantial

evidence in the record." Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir. 1994); 42 U.S.C. § 405(g)

(2005).  "Substantial evidence is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion after reviewing the entire record, but it may be less than a

preponderance."  Id. quoting Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal

quotations omitted).  "Overall, the substantial evidence standard is deferential and includes

deference to inferences drawn from the facts if they, in turn, are supported by substantial

evidence." Schaudeck v. Commissioner of Soc. Sec. Admin., 181 F.3d 429, 433 (3d Cir. 1999).

DISCUSSION

I.      The ALJ's Decision

Claimants must demonstrate that they suffer from a disability as defined by the Social

Security Act in order to receive a benefits award.  A disability is defined as:

> the inability to engage in any substantial activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months ... [The] physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d) (2005).  The Social Security Administration has adopted a system of

sequential analysis for the evaluation of disability claims for disability insurance benefits:

> The sequence is essentially as follows: (1) if the claimant is currently engaged in substantial gainful employment, she will be found not disabled; (2) if the claimant does not suffer from a "severe impairment," she will be found not disabled; (3) if a severe impairment meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 and has lasted or is expected to last continually for at least twelve months, then the claimant will be found disabled; (4) if the severe impairment does not meet prong (3), the Commissioner considers the claimant's residual functional capacity ("RFC") to determine whether she can perform work she has done in the past despite the severe impairment--if she can, she will be found not disabled; and (5) if the claimant cannot perform her past work, the Commissioner will consider the claimant's RFC, age, education, and past work experience to determine whether she can perform other work which exists in the national economy.  See id. § 404.1520(b)-(f).

Schaudeck, 181 F.3d at 431-32; 20 C.F.R. § 404.1520 (2005).  As Judge Hart noted in his Report

and Recommendation, the ALJ determined that Oakes suffered from a series of severe

impairments: lumbar disorder, diabetes mellitus with peripheral neuropathy of the feet, and

11

obesity; but did not entirely credit Oakes' testimony with respect to her limitations.  The ALJ

opined that Oakes retained the RFC to engage in sedentary work limited as follows:

> The claimant can lift and carry less than ten pounds occasionally; can stand and walk for
> less than two hours out of eight; can sit for a total of eight hours out of eight, provided
> that the claimant can alternate standing and sitting positions at will; can never climb
> ladders, ropes or scaffolds; cannot perform activities requiring a sense of balance; can
> climb stairs and ramps, bend, kneel, crouch or crawl no more than occasionally; cannot
> handle, finger and feel more than frequently; cannot reach overhead; should avoid
> concentrated [frequent] exposure to extremes in hot and cold temperatures, wetness, and
> humidity; and should avoid all hazards such as moving machinery and unprotected
> heights.

Relying on the testimony of the vocational expert, the ALJ determined that Oakes' past work as

an insurance clerk did not require her to perform activities prohibited by her limitations.  Thus,

the ALJ determined that she could return to prior work.  In the alternative, the ALJ found that she

could make an adjustment to other occupations, including charge account clerk, callout operator,

and surveillance systems monitor.  The ALJ, therefore, concluded that Oakes was not disabled.

## II.        The Report and Recommendation

Reviewing evidence of Oakes' diabetes causing peripheral neuropathy in her feet, motor

function abnormalities caused by her 1978 stroke, lumbar impairment, and spinal degeneration,

Judge Hart found that substantial evidence supported the ALJ's determination that Oakes'

impairments do not meet Listing 9.08 (Diabetes Mellitus) or 11.14 (Peripheral Neuropathy).[5]

However, Judge Hart found that the ALJ's equivalency decision was not supported by substantial

evidence because the ALJ failed to secure the testimony of a medical expert before determining

that Oakes' impairments did not equal a listed impairment.  Judge Hart, therefore, recommended

---

[5]Oakes does not appear to dispute the ALJ's determination that she did not meet Listing
1.04 (Spinal Disorders).

12

that this case be "remanded for the taking of medical evidence on the subject of whether the combination of the Claimant's impairments equals a listed impairment."

As Judge Hart noted, "the third stage of the statutorily mandated sequential evaluation requires an ALJ not only to determine whether the claimant meets a listing, but whether the combination of her impairments 'equals' a listing."  See Schaudeck, 181 F.3d at 431-32. Discussing the equivalency determination, the Social Security Administration's regulations provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled (see § 404.1520).

20 C.F.R. § 404.1523 (2005).  The Social Security Administration has ruled that although

> an administrative law judge . . . is not bound by a finding by a State agency medical or psychological consultant or other program physician or psychologist as to whether an individual's impairment(s) is equivalent in severity to any impairment in the Listing of Impairments . . . longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight.

Social Security Administration Policy Interpretation Ruling Titles II and XVI, SSR 96-6p, 1996 WL 374180, at *3 (Jul. 2, 1996); see also 20 C.F.R. §§ 404.1526(b), 404.1527(f)(1), 404.1615(d), 404.1616(c) (2005).

The Commissioner consistently has argued in this case that the Social Security Administration fundamentally altered this longstanding policy by allowing an ALJ to use medical

13

expert testimony when appropriate rather than requiring the opinion of a medical consultant to determine whether a claimant met or equaled a listed impairment under the Administration's testing modifications.  See 20 C.F.R. § 404.906(b)(2); Testing Modifications to the Disability Determination Procedures, 60 Fed. Reg. 20023, 20025 (Apr. 24, 1995); Modifications to the Disability Determination Procedures; Disability Claims, Process Redesign Prototype, 64 Fed. Reg. 47218, 47219 (Aug. 30, 1999) (instituting the testing modifications for cases decided within the Commonwealth of Pennsylvania and nine other states).  Judge Hart disagreed.  After reviewing Oakes' impairments--degenerative back disease, diabetic neuropathy, residual effects of her stroke, skin disease that aggravates her diabetes, obesity, depression--and finding that "the requirement of a medical opinion on equivalence is not an onerous one," Judge Hart ruled that the testing modifications did not overturn the Administration's longstanding policy that an ALJ's equivalence determination be informed by a specific medical opinion.  Judge Hart found that the language of Section 404.906 did not overturn this longstanding policy; rather, he found that SSR 96-6p and Section 404.906 could easily co-exist because SSR 96-6p explains that the Disability Determination Transmittal form provided by a medical expert is not the only source of evidence with respect to the equivalency determination: "Other documents, including the Psychiatric Review Technique Form and various other documents on which medical and psychological consultants may record their findings, may also ensure that this opinion has been obtained at the first two levels of administrative review."  SSR 96-6p, 1996 WL 374180, at *3.  Because the

record did not include any other documents regarding the equivalency determination, Judge Hart was unwilling to assume that the testing modifications had eliminated the requirement that an ALJ seek a medical opinion with respect to whether a claimant's combined impairments equal a listed impairment.

III.    Review of Report and Recommendation

I respectfully disagree with Judge Hart.  Initially, I note that by creating these testing *modifications* the Administration implicitly established a change from prior Administration policy.  The language of Section 404.906 implicitly acknowledges this shift.  Section 404.906(a) states that the testing modifications were established "[n]otwithstanding any other provision in this part or part 422 of this chapter."  Specifically, the Administration established these testing modifications to enable the Administration to test, inter alia, the effect of "having a single decisionmaker make the initial determination with assistance from medical consultants, where appropriate; and eliminating the reconsideration step in the administrative review process and having a claimant who is dissatisfied with the initial determination request a hearing before an administrative law judge."  Id.

Having established that there was a shift in policy under the testing modifications, the question becomes whether this change has altered the longstanding policy that an ALJ is required to seek a medical opinion on the issue of equivalence.  I find that it has.  Section 404.906(b)(1) provides:

In the single decisionmaker model, the decisionmaker will make the disability determination and may also determine whether the other conditions for entitlement to benefits based on disability are met.  The decisionmaker will make the disability determination after any *appropriate* consultation with a medical or psychological consultant.  . . .  However, before an initial determination is made that a claimant is not

15

disabled in any case where there is evidence which indicates the existence of a mental impairment, the decisionmaker will make every reasonable effort to ensure that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable residual functional capacity assessment pursuant to our existing procedures.

§ 404.906(b)(1) (emphasis added). If the ALJ is to make a disability determination "after any *appropriate* consultation with a medical or psychological consultant," then there must be circumstances in which such consultation is not appropriate. If there are circumstances in which medical or psychological consultation is not appropriate, then such consultation is no longer required, in contrast to the Administration's pre-testing modifications policy.

Oakes argues that the statement in Section 404.906 that "[t]he decisionmaker will make the disability determination after any appropriate consultation with a medical or psychological consultant," should be read as continuing to require the decisionmaker to consult a medical expert. I disagree. The change in policy under the testing modifications from mandatory to discretionary use of medical experts on the issue of equivalency is confirmed by the comment and response regarding the Administration's interpretations of the testing modifications. 60 Fed. Reg. at 20025. As discussed in the comment and response, "[s]everal commenters raised concerns regarding the apparent lack of involvement of the medical consultant in making disability determinations because the medical consultant would not be required to sign the disability determination forms used to certify the determination of disability to us." Id. In response to these concerns, the Administration explained that the fact that the Administration intends to test the single decisionmaker model "does not mean that the medical consultant is being removed from the decisionmaking process." Id. Rather, the Administration added that under the testing modifications, "[t]he decisionmaker will consult with the medical consultant

16

whenever *appropriate*." Id. (emphasis added).  Again, the use of the word "appropriate" suggests that there are circumstances in which consultation with a medical expert on the issue of equivalency is not appropriate and places the decision to seek such a consultation in the sound discretion of the ALJ.  Although the response states that "the decisionmaker will make every reasonable effort to ensure that a qualified psychiatrist or psychologist completes the medical portion of the case review and any applicable residual functional assessment" before determining that an individual is not disabled, the decisionmaker need only consult with such a medical expert in "situations where the decisionmaker finds that a consultation is *appropriate*." Id. (emphasis added).  The Administration concluded this specific response by stressing that "the single decisionmaker concept is based on the premise that the decisionmaker is fully competent to make an initial determination when an individual files an application for benefits based on disability.  It also gives the decisionmaker flexibility to make such determinations without having to wait for the medical consultant to take part formally in the determination." Id.   Section 404.906 and the comment and response in the Federal Register materials establish that under the testing modifications an ALJ is fully competent to make the disability determination and is not required to consult a medical expert in the medical equivalency determination, but rather should seek a medical consultation when appropriate.  This is a clear change in Administration policy.[6]

_____

[6]I am obliged to credit the Administration's interpretation of Section 404.906 in the comment and response because the Administration's construction of its own regulations is reasonable and does not violate any constitutional or statutory mandate.  "Courts grant an agency's interpretation of its own regulations considerable legal leeway.  And no one here denies that the Agency has properly interpreted its own regulation." Barnhart v. Walton, 535 U.S. 212, 217 (2002); Auer v. Robbins, 519 U.S. 452, 461 (1997); Martin v. Occupational Safety and Health Review Comm'n, 499 U.S. 144 (1991) ("It is well established 'that an agency's construction of its own regulations is entitled to substantial deference.'") quoting Lyng v. Payne, 476 U.S. 926, 939 (1986); Gardebring v. Jenkins, 485 U.S. 415, 429-30 (1988) ("when it is the

Citing the Seventh Circuit's review of the disability benefits decision by an ALJ located in Indiana in Barnett v. Barnhart, 381 F.3d 664, 670-71 (7th Cir. 2004), Oakes argues that an ALJ's failure to consult a medical expert on the issue of equivalency or review of a SSA-831-U5, or other similar documentary evidence, violates Section 404.1526(b)'s requirement that decisions regarding medical equivalence be based on medical findings and SSR 96-6p's policy requirement that the decisionmaker review the judgment of a medical expert on the issue of equivalence. However, Barnett is easily distinguishable from the present case because that case arose in a state which presently is not subject to the testing modifications of Section 404.906.  See 64 Fed. Reg. at 47219.

Referring me to my colleague Judge DuBois' opinion in Cliggett v. Barnhart, No. 05-0583, 2005 WL 2304737 (E.D. Pa. Sep. 20, 2005), Oakes also argues that any ambiguity in the interpretation of Section 404.906 regarding medical expert testimony to support an equivalency determination should be construed in favor of applying the more favorable, pre-testing modification policy requiring medical expert testimony.  I do not find Cliggett to support this proposition.  In Cliggett, Judge DuBois remanded the claimant's case to the ALJ in order to give the Commissioner an opportunity to set forth her position on the applicability of Listing 1.08 (Soft Tissue Injury), which recently had become effective and appeared to be unclear.  Id. at *5.  Finding the Court of Appeals' language in Coppola v. Barnhart, 99 Fed. Appx. 365 (3d Cir. 2004) ("If it is determined that the new regulation is more favorable to the claimant than the

---

Secretary's regulation that we are construing, and when there is no claim in this Court that the regulation violates any constitutional or statutory mandate, we are properly hesitant to substitute an alternative reading for the Secretary's unless that alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation.").

original version, she should be entitled to rely on the more expansive construction"), to be instructive, Judge DuBois held that "when final changes to Social Security regulations are made, the new regulations should be applied to claims of applicants for benefits that are pending at any stage of the administrative review process.  If a new regulation is more favorable to a claimant than the original version, the claimant should be entitled to rely on the new regulation."  <u>Cliggett</u>, 2005 WL 2304737, at *4.

      <u>Cliggett</u> does not support Oakes' argument that I should apply the Administration's pre-testing modification policy requiring medical expert testimony on the issue of equivalency for four reasons.  First, I do not find any ambiguity in Section 404.906's instruction for an ALJ to consult with a medical expert on the issue of equivalency when appropriate.  Second, Judge DuBois did not remand the case in <u>Cliggett</u> for the application of a standard that was more favorable to the claimant; rather, he remanded the case to allow the Commissioner to explain the applicability of Listing 1.08 to epidural fibrosis before he decided that issue.  Third, <u>Cliggett</u> does not hold, as Oakes appears to suggest, that a disability claimant should be allowed to rely on an historical policy or standard of review because it is more favorable to her case.  Fourth, to do so would be to undermine the testing modifications program and prevent any future change that the Administration would seek to make to its disability determination process.

## IV.     Review of the ALJ's Decision

      The ultimate question therefore is whether the ALJ's decision under the testing modifications is supported by substantial evidence.  I agree with Judge Hart that substantial

evidence supported the ALJ's determination that Oakes' diabetes causing peripheral neuropathy in her feet, motor function abnormalities caused by her 1978 stroke, lumbar impairment, and spinal degeneration do not meet Listing 9.08 (Diabetes Mellitus) or 11.14 (Peripheral Neuropathy).

I also find that substantial evidence supported the ALJ's determination that Oakes' impairments do not equal these listings. "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to all the criteria for the one most similar listed impairment."  Sullivan v. Zebley, 493 U.S. 521, 531 (1990) citing 20 C.F. R § 416.926(a) (2005) (providing that a claimant's impairment is equivalent to a listed impairment "if the medical findings are at least equal in severity" to the medical criteria for "the listed impairment most like [the claimant's] impairment"); 20 C.F.R. § 404.1526(a) ("If your impairment is not listed, we will consider the listed impairment most like your impairment to decide whether your impairment is medically equal.  If you have more than one impairment, and none of them meets or equals a listed impairment, we will review the symptoms, signs, and laboratory findings about your impairments to determine whether the combination of your impairments is medically equal to any listed impairment.").

After considering whether Oakes' impairments met the requisite criteria for Listings 1.04 (Spinal Disorders), 9.08 (Diabetes Mellitus), and 11.14 (Peripheral Neuropathies), and the additional and cumulative effects of Oakes obesity, the ALJ "note[d] that a finding of generalized symptomatology [e.g. back pain, sensory deficit, exertional fatigue, etc.] is insufficient to satisfy the full criteria of the cited Listings.  Rather, the full criteria to meet or equal these Listing

requires that *specific* symptoms, functional limitations and/or diagnostic test results be medically documented."  Although medical evidence supported a finding that Oakes had "features of lumbar, diabetes, peripheral neuropathy, and obesity impairments," the ALJ found:

> that neither the claimant nor her legal counsel cited specific symptoms, functional limitations, and/or diagnostic test results of the necessary character and severity as earlier indicated; that the evidentiary record fails to document the existence of diagnostic test results which support he degree of severity as suggested by the claimant's legal counsel; that no such medical findings are indicated or suggested by the clinical medical evidence of record; and that no treating or examining physician has reported medical findings which either meet or are equivalent in severity to the criteria of these or any other listed impairment.

The ALJ therefore concluded that Oakes' "lumbar, diabetes, peripheral neuopathy, and obesity impairments neither meet nor are equivalent in severity to the requisite criteria" set forth in Listings 1.04, 9.08, 11.14 or any other listed impairment.  In other words, the ALJ could not find Oakes' impairments to equal the listed impairments because she failed to prove the existence of the objective symptoms associated with such listed impairments.

In discussing Oakes' Residual Functional Capacity, the ALJ also confessed "serious reservations as to whether the claimant's assertions can be considered fully credible concerning the degree of severity of her impairments, in that there are inconsistencies in the record which do not reflect well on the totality of the claimant's allegations."  Specifically, the ALJ found that notwithstanding her claimed impairments, Oakes was able to engage in numerous daily activities, including: "helping to do the laundry [without lifting or carrying], going grocery shopping [with assistance], taking the bus to doctor appointments [with difficulty], taking public transportation to psychotherapy sessions [accompanied by her mother], reading, and listening to music."  Oakes similarly reported that she is functionally independent with activities of daily living.  Even giving

21

Oakes the benefit of the doubt that she performs these daily activities with difficulty and/or assistance, the ALJ concluded that her level of activity does not correspond with the severity of her alleged impairments.  The ALJ also found significant inconsistencies with the reports of Oakes' treating physicians.  Lastly, the ALJ noted specific areas where the record was devoid of objective evidence to suggest that Oakes impairments meet a Listing.  Weighing Oakes' subjective allegations against objective medical evidence and other information with respect to credibility, the ALJ concluded that "the claimant's assertions are of only fair credibility concerning the . . . intensity, persistence and limiting effects of her impairments, in that the claimant's assertions are exaggerated and not supported by the medical evidence of record."

I agree and find the ALJ's decision to be supported by substantial evidence.  I will therefore deny Oakes' motion for summary judgment and grant the Commissioner's motion for summary judgment.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SHARON OAKES                       :                    CIVIL ACTION
                                   :
            v.                     :
                                   :
JO ANNE B. BARNHART,               :                    NO. 04-5072
Commissioner of Social Security    :
Administration                     :

## ORDER

AND NOW, this 18th day of October 2005, upon consideration of the parties' cross

motions for summary judgment, defendant's response, and plaintiff's reply thereto, Magistrate

Judge Hart's Report and Recommendation, defendant's objections, and plaintiff's response

thereto, and the parties' oral arguments, and for the reasons set forth in the accompanying

memorandum, it is ORDERED as follows:

1.      Plaintiff's motion for summary judgment is DENIED.

2.      Defendant's motion for summary judgment is GRANTED.

3.      Judgment is entered in favor of defendant, Jo Anne B. Barnhart, Commissioner of the

        Social Security Administration, and against plaintiff, Sharon Oakes.


                                   s/ Thomas N. O'Neill, Jr.
                                   THOMAS N. O'NEILL, JR., J.